IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAMONT GIST                    :    CIVIL ACTION
                               :
              v.               :
                               :
DAVID DIGUGLIELMO, et al.      :    NO. 05-4250


MEMORANDUM

McLaughlin, J.                           August 25, 2009


          Petitioner Lamont Gist filed a petition for habeas
corpus in this Court pursuant to 28 U.S.C. § 2254.  The
petitioner, who is currently incarcerated in the State
Correctional Institution at Graterford, Pennsylvania, challenges
his conviction for first degree murder, aggravated assault, and
possessing instruments of a crime.  The habeas petition was
referred to the Honorable Magistrate Judge Linda K. Caracappa.
Judge Caracappa has filed a Report and Recommendation,
recommending that the petition be denied and dismissed and that
there is no basis for the issuance of a certificate of
appealability.  The petitioner has filed objections to the Report
and Recommendation, which for the first time have requested an
evidentiary hearing on newly-acquired evidence.  For the reasons
below, the Court dismiss the petition and deny the petitioner's
request for an evidentiary hearing and a certificate of
appealability.

I.    <u>BACKGROUND</u>

    A    <u>The Petitioner's Trial</u>

       At around 10:40 p.m. on August 30, 1996, in a parking lot off Germantown Avenue in Philadelphia, Ruben Simmons was shot and killed and Brian Johnston was shot and injured.  The petitioner, Lamont Gist, was arrested and charged with the shootings.  He was tried before a jury for first degree murder, aggravated assault, and possession of the instruments of a crime in the Criminal Trial Division of the First Judicial District of Pennsylvania, Philadelphia, from July 23 to August 1, 1997.

       At trial, the prosecution contended that Gist had shot Ruben Simmons and Brian Johnston as the culmination of an escalating series of conflicts among Gist, Simmons, Johnston, and their friends.  The prosecution's key witness was Brian Johnston, who identified Gist as the man who shot both him and Simmons. The defense contended that Gist was not the shooter and that Simmons and Johnston had been shot by another man, Anthony Grant, also known as "Roster," who had also been part of the escalating hostilities.  The defense's key witness was Abid Stevens who testified that he had seen Grant shoot Simmons and Johnston.[1]

---

    [1]    The Court's summary of the testimony at trial is not comprehensive and does not discuss witnesses and testimony that do not directly concern the issues raised in the habeas petition.

1.  <u>The Government's Case</u>

   a.  <u>Johnston's Testimony Concerning the Shooting</u>

Brian Johnston testified at trial that he was with Ruben Simmons all day on August 30, 1996.  That night, as Johnston and Simmons were driving in Simmons' car, Simmons received a page.  Johnston and Simmons then drove to the parking lot off Germantown Avenue and joined a group of four or five people who were there shooting dice.  Johnston recognized one of the people already there as Abid Stevens.

Johnston testified that Abid Stevens left the group and, several minutes later, Lamont Gist walked up, said to Ruben Simmons, "I heard you were looking for me," and began shooting.  Johnston testified that he saw Gist shoot Johnston, and then everyone scattered and began to run.  Johnston ran halfway down the block and hid, but saw Gist coming towards him on the other side of the street.  Johnston ran back toward the parking lot, and Gist fired two shots at him, hitting him in the foot.  Johnston kept running until he was able to get into a car and be driven to a friend's house at 330 Vernon Street where the police were called.  Johnston testified that Anthony "Roster" Grant was not present when he was shot.  7/24/97 N.T. at 11-13, 22-28, 41, 58-59, 65, 69-75, 82.

The government presented testimony from two police officers who responded to the call from 330 Vernon Street.  Both

Officers James Middleton and Jeffery Hannan testified that they arrived separately at 330 Vernon and spoke to Johnston who identified the person who shot him and Ruben Simmons as "Lamont" or "Mont."  Johnston was taken to the hospital where he repeated his identification of Lamont as the shooter.  After being discharged, Johnston was taken to the homicide division where he gave a statement and identified Lamont Gist out of a photo array as the person who shot him and Ruben Simmons.  7/24/97 N.T. at 91, 96, 100-102; 7/25/97 N.T at 34-38.

        b.   <u>The Physical Evidence Concerning the Shooting</u>

       The government also offered testimony concerning the physical evidence of the crime from the medical examiner, an officer of the mobile crime detection unit, and a ballistic expert.  Twelve, fired 40-caliber cartridge casings were recovered by the police, ten in the parking lot where Ruben Simmons was shot and two found 300 feet away near where Brian Johnston was shot.  A copper jacket from a bullet was also recovered in the parking lot.  Ballistic evidence indicated all twelve cartridges were ejected from the same gun, a semi-automatic.  No tests could be performed on the copper jacket or from fragments recovered from Ruben Simmons body.  7/24/97 N.T. at 142-45, 153-54; 7/25/97 N.T. at 8-9, 13-15.

4

The medical examination of Ruben Simmons' body showed three gunshot wounds.  Simmons had a wound on his right little finger and palm consistent with a defensive injury caused by his putting his hands up to protect himself from a gun.  He also had a shallow wound in his chest from a small bullet fragment, possibly the same bullet that hit his hand.  The third wound was from a bullet that entered the back of Simmons' head and exited underneath his left eye, severing his brain from his spinal cord and causing his death.  Simmons' body also had scrapes and abrasions consistent with collapsing from a standing position. From the lack of stippling on the wounds, the medical examiner opined that each shot that hit Simmons was fired from a gun that was at least two or two and a half feet from Simmons' body. 7/24/97 N.T. at 122-141.

        c     Evidence of Earlier Incidents Between Gist and Simmons and Between Simmons and Grant

In addition to evidence concerning the events of the night of August 30, 1996, the government also introduced evidence of prior altercations between Gist, Simmons, Johnston, and Anthony "Roster" Grant.

1)      August 15, 2009, Shooting Involving
        Simmons, Johnston, Gist, Stevens, and
        Anthony "Roster" Grant

In his direct examination by the prosecution, Brian
Johnston testified that two weeks before the shooting, in the
evening of August 15, 1996, he had been with Simmons and another
friend, Kadir Greene, when Simmons went to pick up his car at the
house of another friend.  They drove to the house in Greene's
truck.  Simmons went inside while Greene and Johnston waited in
the truck.  Johnston testified that he saw Gist and Abid Stevens
walking towards them with guns.  Gist and Stevens pulled Johnston
from the truck and began punching him and hitting him with their
guns.  Johnston then ran from the scene.  7/24/97 N.T. at 36-40.

The government also presented testimony concerning the
August 15, 1996, incident from Kadir Greene, who described
himself as a friend of both Johnston and Simmons and of Gist and
Abid Stevens.  Greene testified that earlier on August 15th,
Simmons got into a fist fight with a man named Eric Forbes, whom
Greene described as one of Simmons' friends.  Forbes believed
Simmons had stolen money and drugs from Forbes' house.  Before
the fight, Simmons gave his gun to another friend named Anthony
Middleton to hold.  Anthony "Roster" Grant then took the gun from
Middleton.  After the fight, Simmons went looking for his gun and
confronted Grant.  When Grant denied having the gun, Simmons hit
Grant in the head with a bottle and took the gun back.  Grant and

Simmons then parted ways.  A short time later, at around 5:00 that afternoon, Greene saw Grant, Abid Stevens, and Lamont Gist drive by Simmons in a car and look at him.  7/23/97 N.T. at 127-134, 162-63, 165-69.

Greene also testified about the incident later that evening at the Whitehead house.  He testified that he, Simmons and Johnston had gone to the house to pick up Simmons' car and that, while Simmons was inside, Gist, Stevens, and Grant walked up.  Stevens and Gist drew guns.  Gist's gun had a laser pointer that projected a red beam of light on its target.  Stevens then pulled Brian Johnston from Greene's truck, and Gist and Stevens began to hit him with their guns.  After the beating, Grant, Stevens, and Gist began to move away, and Greene lost track of Johnston.  Simmons then came out of the house with a gun, and Greene saw a spot of light from a laser sight come from Gist's direction towards Simmons.  Simmons jumped off the porch of the house with his gun drawn, and Greene ducked down in his truck and heard shots fired.  Greene and Simmons got in Greene's truck and drove off.  Greene testified that, after he dropped Simmons off, he went back to Gist and Stevens and told them "don't play with guns" while he was there.  Greene testified that he remained friendly with Gist, Stevens, and Grant and with Johnston and Simmons, despite their hostility towards each other.  7/23/97 N.T. at 135-146, 149-51, 183-85.

7

(2)   Simmons and Johnston's Kidnapping of
Anthony "Roster" Grant Sometime between
August 15 and August 30, 1996

On cross-examination, Brian Johnston testified that, one day, sometime between August 15 and August 30, 1996, he and Simmons took Anthony "Roster" Grant from the house where Grant was staying and brought him to Johnston and Simmons' house, where they tied him to a chair in the basement and hit him.  They then left him alone in the basement and, when they returned half an hour later, Grant was gone.  Johnston testified that he and Simmons took Grant and beat him up in retaliation because "Lamont [Gist] was going around shooting our friends."  7/24/97 N.T. at 47-55.

(3)   The August 30, 1996 "Peace Meeting"

Brian Johnston testified that, in the afternoon of August 30, 1996, the day of the shooting, a "peace meeting" was held at a playground on Chew Avenue.  The people attending were Johnston, Simmons, Abid Stevens, Grant, and Gary Payne Smith. Lamont Gist did not attend.  Johnston testified that the purpose of the meeting was to settle or "squash" the hostilities that had begun since the "truck incident" on August 15th.  At the end of the meeting, all those attending shook hands, and Johnston testified that he believed the parties' differences had been worked out.  7/24/97 N.T. at 41-45.

8

d     The Search of Gist's Apartment and the
          Recovery of Two Guns

The government presented testimony from Detective Charles Permit concerning his arrest of Lamont Gist and his subsequent search of the house where Gist was found.  A warrant for Gist's arrest was issued August 31, 1996.  Detective Permit testified that, acting on a tip he received from an unnamed confidential informant, he arrested Gist on September 11, 1996, at the apartment of Joanne McDowell.  He obtained McDowell's consent to search the apartment.  In the search, Detective Permit found two loaded nine millimeter handguns in the bedroom of the apartment in a laundry bag placed inside a box on the floor of the bedroom closet.  7/24/97 N.T. at 162-63, 170-71, 196-97.

The government's ballistic expert testified on direct examination that he had examined the two guns recovered from the apartment where Gist was arrested.  He testified that the serial number of one of the guns had been removed by abrasion, but he had been able to restore it.  He also testified both on direct examination and on cross that neither of the two guns was a match to the cartridge casings fired at the scene of Simmons and Johnston's shooting. 7/25/97 N.T. at 7, 16, 31-32.

e    Abid Steven's Statement that Anthony "Roster"
Grant was the Shooter and Abid Steven's
Identification as a Prime Suspect in Anthony
"Roster" Grant's Murder

The government presented testimony from Detective
Eugene Wyatt, the assigned detective on the case, concerning his
interviews with Brian Johnston the night of the shooting and his
subsequent preparation of an arrest warrant for Lamont Gist on
August 31, 1996.  On cross-examination, Wyatt was asked about an
interview he had with Abid Stevens on September 7, 1996.  Wyatt
testified that Stevens told him that Anthony "Roster" Grant had
shot Ruben Simmons and Brian Johnston.  On redirect, Detective
Wyatt testified that Abid Stevens was in police custody on
September 7, 1996, on an unrelated charge, when he told officers
he had information on the Simmons-Johnston shooting.  Detective
Wyatt also testified that he subsequently learned that Grant had
been shot and killed on September 6, 1996, the day before Abid
Stevens identified Grant as the shooter.  On recross, Detective
Wyatt was asked whether the police had investigated Grant's death
and responded that Abid Stevens was the prime suspect in Grant's
death:

> Q    By the way, has your office conducted an
> investigation into the shooting death of
> Anthony ["Roster"] Grant?
>
> A:    Yes.
>
> Q    And with any success?

A     Yes, Abid Stevens is the prime suspect.

7/25/97 N.T. at 34-35, 38-39, 41-42, 45-47.

2.  <u>The Defendant's Case</u>

a.  <u>Testimony of the Defense's Alibi Witness</u>

The defense presented testimony from Joanne McDowell,
Lamont Gist's girlfriend, and the owner of the apartment where
Gist was arrested.  McDowell testified that Gist moved in with
her on August 12, 1996, and stayed with her until his arrest on
September 11, 1996.  McDowell left every weekday from 5:00 a.m.
to 3:30 p.m. to go to work and Gist would watch her two children.
She testified that every day, Gist was at her apartment when she
came home from work and that they never left the house during the
time that she was home.  On the day of the shooting, August 30,
1996, McDowell testified that she was off work and that she and
Gist remained in the apartment the entire day and night, looking
after her kids, watching TV, and then going to bed.  7/28/97 N.T.
at 17-23.

On cross-examination, the prosecutor brought out
inconsistencies between McDowell's testimony and what she had
told the police at the time of Gist's arrest.  In her formal
statement to the police after Gist's arrest, McDowell did not say
that she and McDowell had been together the night of the
shooting.  McDowell explained this by saying she had not been

11

asked whether they had been together at that time.  McDowell
admitted that she had told the police when Gist was arrested that
he did not live with her.  McDowell explained the inconsistency
by saying that Gist was staying with her, but did not live with
her.  When asked the day of the arrest whether Gist used the
front or back door when visiting her, McDowell said he used the
back door.  McDowell explained that this answer was consistent
with her trial testimony that Gist had never left her apartment,
because she had been referring to how Gist entered her apartment
when he arrived a month earlier on August 12, 1996.  McDowell had
been asked the day of the arrest what kind of car Gist drove and
she had responded that he drove a green Volvo.  At trial McDowell
testified that Gist had bought the green Volvo two days before
his arrest from a friend who had parked it near her house, but
Gist had never driven it.  McDowell also testified that, although
she knew that Gist had been with her the night of the shooting,
she still asked Gist whether he had shot Simmons and Johnston.
7/28/97 N.T. at 43-51, 56-61, 67-70, 79-85.


            b    Testimony Concerning Hostility Between
                 Simmons and Anthony "Roster" Grant

        The defense called Gary Payne Smith, one of the
participants in what Brian Johnston described as a "peace
meeting" held in the afternoon of the day of the shooting, August
30, 1996.  He testified that the persons attending the meeting

                              12

were Smith, Abid Stevens, Anthony "Roster" Grant, Ruben Simmons,
and Brian Johnston.  Lamont Gist did not attend.  Smith testified
that he organized the meeting to discuss and settle the animosity
between Simmons and Grant.  He testified that Grant was seeking
money from Simmons because Simmons had shot Grant in the leg and
that Grant wanted the money in return for not saying anything
about the shooting if he were questioned in court.  Grant and
Simmons also discussed Grant's being kidnapped by Simmons and
Brian Johnston.  Smith testified that the meeting ended without
an agreement and that Grant told Simmons that he would see him in
court.  Smith said that he observed that Grant feared Simmons.
7/28/97 N.T. at 92-99.

                  c     Testimony from Eyewitnesses to the Shooting
                      Who Could Not Identify the Shooter

        The defense presented testimony from three men who were
at the Germantown Avenue parking lot when Simmons and Johnston
were shot:  Tariq Fowler, Michael Brown, and Robert Daniels.
These three men each testified that they were at the dice game
the night of August 30, 1996 with Abid Stevens and that Simmons
and Johnston arrived at the game sometime later.  All three
testified that someone walked up and began shooting but that none
of them saw the shooter.  They each testified that they knew both
Lamont Gist and Anthony "Roster" Grant and that none of the three
saw either Gist or Grant at the parking lot the night of the

shooting.   7/28/97 N.T. at 110-111, 114-120, 134-36, 137-47, 161, 166-70, 175, 178-79.


> d    Abid Stevens' Testimony Identifying Grant As
>         the Shooter

Abid Stevens was called as a witness for the defense. At the time of his testimony, he was seventeen and incarcerated in a state juvenile facility for weapon and drug offenses. Stevens testified that he had been arrested on September 7, 1996, and at that time gave a statement to Detective Wyatt about the shooting of Simmons and Johnston.  Stevens told Detective Wyatt that the shooter was Anthony "Roster" Grant, whom Stevens described as a good friend.  Although Grant had been killed the day before, Stevens said that he did not know that Grant was dead at the time he gave his statement.  7/29/97 N.T. at 37-41, 44.

Stevens also said that Detective Wyatt had visited him in the juvenile facility approximately two and a half weeks before his testimony at Gist's trial and had questioned him about Grant's murder.  Stevens said Wyatt told him that Gist had been involved in four homicides and a number of shootings and that Wyatt had heard that Stevens had been present at some of them. Wyatt told Stevens that, if Stevens and Gist had been involved in shooting Grant, then Stevens should tell the truth, but that, if Stevens was involved and lied to him, then Wyatt would make sure that Stevens did more time than Gist.  Stevens testified that

14

Wyatt also questioned Stevens again about who had shot Simmons, and Stevens again told him that Grant was the shooter.  7/29/97 N.T. at 42-44.

Stevens testified that, on the night of August 30, 1996, he was at the parking lot off Germantown Avenue, with a group of men playing dice.  About a half an hour after Stevens arrived, Ruben Simmons and Brian Johnston drove by, parked their car nearby, and walked up to the game.  Simmons participated in the betting, but Johnston just watched.  Stevens testified that, after a couple of minutes, Simmons asked Johnston to go to their car and get a beer.  Johnston went to get the beer, and Stevens testified that he did not see Johnston again that night.  Stevens testified that, a minute or two after Johnston left, a man walked up and shot Simmons.  7/29/97 N.T. at 44-51, 54.

Stevens testified that, while both he and Simmons were leaning over the game, someone walked up and said, "You looking for me, pussy."  Stevens testified that he was not paying attention to the man who approached, but recognized him as Grant by his accent.  He then saw the man point a gun at Simmons' chest.  Simmons grabbed for the gun and both men struggled for it.  Stevens testified that, as they each pulled for the gun, Simmons tripped and the gun went off and hit him in the hand. Stevens said that, as Simmons turned to run, one or two shots were fired, and Simmons fell to the ground.  Stevens said that he

15

then ran away to a friend's house.  He testified that he then went to his house to retrieve a firearm and take it to another friend's house, so that the police would not find it if they came to question him.  7/29/97 N.T. at 51-55.

Stevens testified that he did not see Lamont Gist on the night of the shooting on August 30, 1996 and that he had not seen Gist since July and did not see him again until after he was arrested on September 7, 1996.  Stevens also testified that he told a friend named Brian Randle about the shooting, telling him that Grant shot Simmons.  7/29/97 N.T. at 50, 58-60.

On cross-examination, Stevens admitted that he never got a good look at the face of the person who shot Simmons, and that he recognized the shooter as Grant only because of his voice.  Stevens conceded that he could not say for sure that Gist was not present the night of the shooting and that he could not say for sure that Gist wasn't the shooter.  Stevens reiterated that the shooter's gun went off while Simmons and the shooter were struggling for the gun and while the two were two or three feet apart.  Stevens denied telling Brian Randle that Gist shot Simmons.  Stevens also denied being present on August 15, 1999, when Gist was alleged to have been involved in a shooting with Simmons, Johnston, and Kadir Greene.  7/29/97 N.T. at 64-65, 65-67, 69, 74-77, 79-83.

16

On redirect examination, Stevens clarified that he saw the side of the shooter's face, but that the shooter was wearing glasses and a hat.  7/29/97 N.T. at 85-86.  On recross, Stevens clarified that he did not see the face of the shooter clearly but that he could say it "possibly was Roster" because Stevens recognized his voice.  7/29/97 N.T. at 91-92.

### 3   Jury Deliberations

After closing arguments by the prosecution and the defense, the jury began deliberating on July 30, 1997.  On August 1, 1997, the jury asked to have the testimony of Brian Johnston and Abid Smith read back to it.  The trial court told the jury that the testimony of those witnesses would be read back in the order that they testified.  At the conclusion of reading the entirety of Johnston's testimony, the court ordered a brief recess for the jury's comfort, instructing the jury not to discuss the case.

During that recess, the jury sent the court a note, signed by the foreperson, saying "please be advised that we have all decided that we no longer need to hear Abid Stevens' testimony" and apologizing for any inconvenience.  The defense counsel requested that the court nonetheless require the jury to listen to Stevens' testimony.  The trial court declined, stating on the record that the complete testimony of Johnston had been

17

read back and there was no requirement that the jury re-hear
Stevens' testimony, now that they no longer wanted it.  The jury
continued deliberating for less than two hours and returned with
a verdict that the petitioner was guilty on all charges.  8/1/03
N.T. at 1-9.


     B.    <u>Procedural History of Post-Trial Proceedings</u>

       On August 1, 1997, the petitioner was convicted of
first degree murder, aggravated assault, and possession of the
instruments of crime.  The government sought the death penalty,
but after a sentencing hearing, the jury found no aggravating
circumstances justifying that penalty.  The petitioner was
sentenced to life imprisonment for the murder, ten to twenty
years for the aggravated assault, and two and half to five years
for the possession of instruments of a crime, all sentences to
run concurrently.  After his conviction, the petitioner, with the
assistance of counsel, filed a timely appeal to the Pennsylvania
Superior Court.  The Pennsylvania Superior Court affirmed the
conviction and sentence on May 4, 1999, and the Pennsylvania
Supreme Court denied allocatur on August 11, 1999.

       On January 28, 2000, the petitioner filed a timely pro-
se petition pursuant to the Pennsylvania Post-Conviction Relief
Act ("PCRA"), 42 Pa. C.S. § 9541 et seq.  Petitioner subsequently
obtained counsel through whom he filed an amended petition.  The

18

PCRA court dismissed the petition on May 13, 2002.  Although the PCRA court's order stated that the petitioner's counsel was to remain court-appointed counsel for the purpose of pursuing any appeal of the order, and although the petitioner wrote his counsel on May 20 and June 6, 2002, requesting that he file a notice of appeal, petitioner's counsel did not file an appeal and did not respond to the petitioner's letters until after the 30-day period for filing an appeal of the dismissal of the PCRA petition had passed.

After learning that no PCRA appeal had been filed, the petitioner filed a second PCRA petition on July 29, 2002, seeking nunc pro tunc reinstatement of his rights to appeal.  On January 8, 2003, the PCRA court reinstated the petitioner's appellate rights.  The Pennsylvania Superior Court quashed the appeal on September 9, 2004, finding the petitioner's second PCRA petition untimely.  The petitioner requested reargument before the Pennsylvania Superior Court, which was denied November 9, 2004, and allocatur from the Pennsylvania Supreme Court, which was denied March 28, 2005.

On August 10, 2005, the petitioner filed this petition for habeas corpus, which was referred to Magistrate Judge Linda K. Caracappa.  On January 31, 2006, Judge Caracappa issued a Report and Recommendation that the petition be denied as time-barred.  Judge Caracappa found that, because the petitioner's

second PCRA petition was found not to be timely filed by the Pennsylvania Superior Court, the habeas statute of limitations was not tolled while it was pending, and the petitioner's claims were therefore time-barred and should be dismissed.  The petitioner filed timely objections to the Report and Recommendation, arguing, in part, that the statute of limitations should be equitably tolled.

On consideration of the Report and Recommendation, the then-presiding judge, the Honorable Bruce W. Kauffman, sustained the petitioner's objections on the basis of equitable tolling. Judge Kaufmann found that petitioner only needed to file a second PCRA petition because of his counsel's professionally unreasonable failure to file an appeal of the denial of his first PCRA petition, which "not only deprived Petitioner of the opportunity to file a timely appeal of the denial of his PCRA petition, but also rendered all subsequently filed petitions – including the instant habeas Petition – untimely."  Finding that the petitioner had otherwise exercised reasonable diligence in prosecuting his appeal, Judge Kaufman found sufficiently extraordinary circumstances to justify equitable tolling of the habeas statute of limitations.

After remand and subsequent briefing, Magistrate Judge Caracappa issued a second Report and Recommendation on November 30, 2007, addressing the merits of the petitioner's claims.  This

20

Report and Recommendation is now before this Court.  The petitioner has filed objections to the report, to which the government has responded.

II.  <u>ANALYSIS</u>

    A.  <u>Overview of the Petitioner's Claims</u>

       In his habeas petition, the petitioner raises nine claims for relief.  These claims were reordered and renumbered in the Report and Recommendation of Magistrate Judge Caracappa, and the Court will use this renumbering in referring to the claims in this Memorandum.  The nine claims raised by the petitioner are:

       1)   Trial counsel was ineffective for failing to object to the improper introduction of evidence and testimony concerning two firearms found in the bedroom the petitioner shared with his girlfriend (Petitioner's No. 1);

       2)   Trial counsel was ineffective for eliciting testimony at trial of the unrelated murder of Anthony "Roster" Grant (Petitioner's No. 2);

       3)   The petitioner's due process rights were violated when the trial court improperly allowed evidence of the petitioner's prior bad acts, and the petitioner's trial counsel was ineffective for failing to object to the introduction of such evidence (Petitioner's No. 5);

4)    The government engaged in prosecutorial misconduct by not correcting allegedly perjured testimony that the defense's key witness, Abid Stevens, was a prime suspect in the murder of Anthony "Roster" Grant (Petitioner's No. 3);

5)    The government engaged in prosecutorial misconduct by withholding evidence that one of the prosecution's key witnesses, Brian Randle, was a suspect under investigation in the murder of Anthony "Roster" Grant (Petitioner's No. 4);

6)    The trial court gave inadequate cautionary instructions concerning the testimony of the government's firearms expert (Petitioner's No. 6);

7)    Petitioner's constitutional rights were violated when the PCRA court denied the petitioner an evidentiary hearing in light of after-discovered evidence, including an affidavit by the government's key witness, Brian Johnston, recanting his trial testimony (Petitioner's No. 7);

8)    The trial court improperly read back to the jury testimony of the prosecution's key witness, Brian Johnston, but refused to read back testimony of the petitioner's key witness, Abid Stevens (Petitioner's No. 8); and

9)    A miscarriage of justice occurred because the petitioner is actually innocent (Petitioner's No. 9).

    B    Petitioner's Claims Six and Eight and a Subsection of
       Claim Three Are Procedurally Defaulted

       The Report and Recommendation concludes that the
petitioner failed to fairly present his claims Six, Eight, and a
portion of Claim Three in state court and that these claims are
therefore procedurally defaulted.  The Court, after independent
review, agrees that these claims are procedurally defaulted and
that this default is not excused.[2]

       1.   The Petitioner Did Not Exhaust Claim Six

       Claim Six, that the trial court gave inadequate
cautionary instructions to the jury concerning the testimony of
the government's firearms expert, was not raised in the
petitioner's direct appeal from his conviction or in his PCRA
petition, but was raised in his PCRA appeal.  To preserve a claim
for habeas review, a petitioner must have presented that claim to
each level of the state courts.  O'Sullivan v. Boerckel, 526 U.S.
838, 845 (1999).  By failing to present Claim Six in his PCRA
petition, the petitioner did not fairly present the issue for
state court review and the claim was not properly exhausted.

---

      [2]   In its response to the petitioner's objections to the
Report and Recommendation, the government renews its argument
that all claims in the habeas petition are time-barred.  This
argument was considered and rejected by the prior decision of
Judge Kauffman finding equitable tolling.  This Court will not
revisit that ruling.

2.   <u>The Petitioner Did Not Exhaust Claim Eight</u>

Claim Eight, that the trial court improperly read back to the jury only the testimony of the prosecution's key witness but not that of the defendant's key witness, was raised in the petitioner's direct appeal, but not in his PCRA proceedings. Raising an issue only in a direct appeal but not in collateral PCRA review is sufficient to exhaust it for habeas review.  <u>See</u> <u>O'Sullivan</u>, 526 U.S. at 845 (exhaustion requires "invoking one complete round of the State's established appellate review process").  To properly exhaust a claim, however, a petitioner must present to the state court the same "factual and legal substance" that the petitioner seeks to raise in his habeas proceedings.  <u>McCandless v. Vaughn</u>, 172 F.3d 255. 261 (3d Cir. 1999).

As set out in the Report and Recommendation, the petitioner did not fairly present to the state court the same factual and legal substance raised in Claim Eight.  On direct appeal, the petitioner challenged the trial court's decision not to require the jury to re-hear Abid Stevens' testimony only on state law grounds.  Although the petitioner's direct appeal brief refers to this decision in various places as "egregious," "unfair" and "prejudicial," it does not refer to the decision as unconstitutional or violative of due process.  Instead, the brief cites only state court cases concerning the discretionary

24

authority of the trial judge and argues that the trial court's decision was an abuse of that discretion.  In upholding the trial court, the Pennsylvania Superior Court also relied only on state court grounds, finding no abuse of discretion.

Because the petitioner did not challenge the failure to read back Abid Steven's testimony on constitutional grounds in his direct appeal, the petitioner has failed to exhaust that claim.  To exhaust a claim, it is not sufficient to raise a "somewhat similar state law claim" in state court.  McCandless, 172 F.3d at 261 (internal quotation omitted).  Although a petitioner need not expressly refer to the constitution or federal law, he must have communicated to the state courts that he was asserting a claim predicated on federal law.  Id.  With respect to Claim Eight, the petitioner failed to do so.

### 3    The Petitioner Did Not Exhaust the Due Process Portion of Claim Three

Claim Three is in two parts.  It contends that the petitioner's due process rights were violated when the trial court introduced evidence of his "prior bad acts," particularly the earlier shooting on August 15, 1996.  It also contends that the petitioner's counsel was ineffective for failing to object to the introduction of this evidence.

The petitioner included as one of the "questions involved" in his direct appeal whether the trial court erred in

25

allowing prosecution witnesses to testify concerning these prior bad acts, but did not discuss this issue in the argument section his appeal brief.  The Pennsylvania Superior Court subsequently held that the petitioner's failure to develop the argument waived the issue for appeal.  In the petitioner's PCRA proceedings, neither the petitioner's initial or amended PCRA petition clearly challenged the introduction of "prior bad act" evidence on constitutional grounds.  In its opinion, the PCRA court addressed only whether this evidence should have been introduced as a matter of state law.  In his PCRA appeal brief, the petitioner did attempt to raise a constitutional challenge to the introduction of this evidence, but his appeal was quashed as untimely.

The Report and Recommendation concludes that the petitioner has not exhausted that portion of Claim Three alleging that the introduction of evidence of "prior bad acts" violated the petitioner's due process rights, but has exhausted that portion of Claim Three alleging ineffective assistance from his counsel's failure to object to the introduction of that evidence. The Court agrees.  To the extent the petitioner's filings in his direct appeal and PCRA petition challenged the trial court's allowing "prior bad act" evidence, they did so only on state law grounds.  Although the petitioner did raise a constitutional challenge to the introduction of this evidence in his PCRA

appeal, by not doing so in his PCRA petition, he failed to fairly present his federal claim at all levels of the state court and that claim is therefore not exhausted.  See O'Sullivan, 526 U.S. at 845; McCandless, 172 F.3d at 261.  The second portion of Claim Three, the petitioner's ineffective assistance claim concerning his counsel's failure to object to the introduction of this evidence, was fairly presented in his PCRA petition and ruled upon by the PCRA trial court and therefore is exhausted.

> ### 4    Claims Six, Eight and the Due Process Portion of Claim Three are Procedurally Defaulted and this Default is Not Excused

The petitioner has failed to exhaust Claims Six, Eight and the due process portion of Claim Three.  The petitioner can no longer cure this failure to exhaust because the one-year limitations period for bringing a claim under the PCRA has elapsed.  The petitioner's claims are therefore procedurally defaulted and this default is based on a state procedural law that is independent of the federal question and adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 732 (1991).  Unless excused, the procedural default of these claims prevents habeas review.  Id. at 749-50.

Procedural default can be excused where a petitioner shows cause for the default and actual prejudice or demonstrates that failure to consider the claims would result in a fundamental

miscarriage of justice.  <u>Coleman</u> at 750.  The petitioner has not attempted to make a showing of cause and prejudice with respect to these claims.  The petitioner does make a separate claim of miscarriage of justice in Claim Nine of his petition, but, as discussed in the section of this Memorandum discussing Claim Nine, the petitioner has failed to establish a miscarriage of justice that would excuse the procedural default of his claims.

C    Petitioner's Remaining Claims Will Be Denied on the Merits

Under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, a federal court's habeas review of the merits of a state court's decision is greatly circumscribed.  The statute provides that a habeas petition shall not be granted "with respect to any claim that was adjudicated on the merits in State court" unless the adjudication of the claim either:

> 1)    resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision will fall within the first part of § 2254(d) if it reaches a conclusion opposite to that reached by the United States Supreme Court on a question of law or when confronted with facts that are materially distinguishable from a relevant Supreme Court precedent.  Williams v. Taylor, 529 U.S. 362 (2000).  A state court decision will fall within the second part of § 2254(d) "if the state court identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Id. at 407-08.  In making this determination, a district court must find that a state court acted not just incorrectly, but unreasonably.

AEDPA also requires that a federal court considering a habeas petition by a state prisoner give deference to the state court's factual findings.  A federal court must presume that a state court's determination of a factual issue is correct, and a petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Applying this AEDPA standard of review to the remaining claims of the petition, the Court finds that these claims should be denied.

1    Petitioner's Ineffective Assistance Claims One,
     Two and Three Will Be Dismissed

      a.   Claim One

Claim One asserts that trial counsel was ineffective
for failing to object to the prosecution's introduction of
evidence concerning the two loaded guns seized from the bedroom
where the petitioner was arrested.  The prosecution's ballistic
evidence showed that neither gun was used in the shooting with
which the petitioner was charged.

      The PCRA court reviewed this claim and found that the
evidence was admissible under state law because it was relevant
to showing that the petitioner had access to weapons similar to
those used in the shooting.  The PCRA court also found that the
petitioner's counsel had a reasonable basis for not objecting to
the introduction of the gun evidence because the guns were not
used in the crime at issue and because the fact that the seized
guns differed from those allegedly used by the petitioner in the
earlier August 15, 1996, shooting incident tended to impeach the
credibility of the prosecution's witnesses who testified about
that incident, which the defense denied had occurred.  The Report
and Recommendation agreed that trial counsel's failure to object
to this evidence was not ineffective assistance because trial
counsel emphasized to the jury that neither of the guns was used
in the shooting.

The Court agrees with the conclusion of the Report and Recommendation that this ineffective assistance claim fails, but does so on different grounds.  To establish a claim for ineffective assistance of counsel, a petitioner must show both that his counsel's performance fell below an objective standard of reasonableness and that his counsel's performance prejudiced his defense such that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  A reviewing court need not address whether trial counsel's conduct was deficient, if it can more easily determine that no prejudice resulted from the conduct and thereby resolve the claim.  Id. at 697.

Here, the Court finds that, putting aside the objective reasonableness of trial counsel's failure to object to the introduction of evidence concerning the two guns, there is not a reasonable probability that, but for the introduction of that evidence, the outcome of the trial would be different.  The fact that the prosecution's ballistic expert testified that the two guns were not used in the murder of Ruben Simmons and the shooting of Brian Johnston, and trial counsel's emphasis of this fact in his closing, limited the amount of prejudice caused by

the introduction of the gun evidence.  At most, the introduction
of the evidence of the two loaded guns improperly suggested to
the jury that the petitioner was a violent person with ready
access to firearms.  This prejudicial effect is not sufficient,
in the face of the other evidence at trial, particularly the
eyewitness testimony of Brian Johnston identifying the petitioner
as the shooter, to undermine confidence in the trial's outcome.

         b.   Claim Two

         In Claim Two, the petitioner argues that his trial
counsel was ineffective for asking prosecution witness Detective
Wyatt about the status of the investigation into the unrelated
murder of Anthony "Roster" Grant, the person the defense
contended did the shooting.  The prosecution called Detective
Wyatt to testify about his interviews with Brian Johnston the
night of the shooting and his subsequent preparation of an arrest
warrant for the petitioner.  On cross-examination, defense
counsel asked Detective Wyatt about his interview with defense
witness Abid Stevens, who said he had seen Grant, not the
petitioner, shoot Simmons and Johnston.  On redirect, Wyatt
testified that Grant had been shot and killed the day before Abid
Stevens made his statement.  On re-cross, defense counsel asked
about the status of the investigation into Grant's death, and
Detective Wyatt said that Stevens was the "prime suspect" in

Grant's murder.  The petitioner contends that by eliciting this statement, his trial counsel fatally undermined the testimony of the key witness in his defense.  Both the PRCA court and the Report and Recommendation concluded that this claim failed because the Detective Wyatt's statement did not cause sufficient prejudice to establish ineffective assistance.

The Court agrees that the petitioner has failed to show sufficient prejudice resulting from this error to support an ineffective assistance claim.  Detective Wyatt's statement that Stevens was a prime suspect in Grant's murder prejudiced the petitioner's defense by undermining Stevens' credibility.  In addition to suggesting that the defense's key witness was a murderer, the testimony suggested that Stevens was hostile to Grant and had a motive to falsely accuse him of the murder.  It also suggested that the only witness who identified Grant as the shooter was responsible for Grant's murder.  In the face of the other evidence of the petitioner's guilt and the equivocal nature of Stevens' testimony, however, this prejudice is not sufficient to create a reasonable probability that the outcome of the trial would be different had the evidence been excluded.

Brian Johnston identified the petitioner at trial as the person who shot him and Ruben Simmons.  He also testified that he had identified the petitioner as the shooter out of a photo array the night of the shooting.  Abid Stevens' testimony

that Anthony "Roster" Grant was the shooter was less certain, with Stevens testifying that he did not see the shooter and identified Grant only by voice and, on cross, testifying that he could not say for sure that the petitioner was not present at the shooting or that the petitioner did not shoot Johnston or Simmons.  Stevens' testimony that Simmons was shot while struggling with the shooter was also inconsistent with the prosecution's forensic evidence that the lack of stippling on Simmons' wounds indicated that he was shot from a distance of at least two and half or three feet away.  Given this other evidence of the petitioner's guilt, his trial counsel's questioning of Detective Wyatt, prompting his identification of Stevens as a prime suspect in Anthony "Roster" Grant's murder, does not undermine confidence in the verdict or create a reasonable probability that, had this testimony not been elicited, the outcome of the trial would have been different.

c.   <u>Claim Three</u>

Petitioner's Claim Three asserts that his counsel was ineffective for failing to object to the government's introduction of evidence and testimony concerning the petitioner's "prior bad acts," including his involvement in the alleged shooting incident on August 15, 1996, involving the petitioner, Abid Stevens, Ruben Simmons, Brian Johnston, and

34

Kadir Greene.  The petitioner also asserts his appellate counsel was ineffective for failing to raise this claim in his direct appeal.

The PCRA court considered and rejected this argument, finding that the petitioner's trial counsel was not ineffective because he had objected to this evidence in a motion in limine prior to trial.  The trial court denied the limine motion in part and granted it in part, allowing evidence about the prior August 15, 1996, altercation between the petitioner and the shooting victims, Simmons and Johnston, but excluding evidence concerning alleged violent acts involving the petitioner and others.  The PCRA court found that this evidence was admissible as evidence of "bad blood" between the petitioner and the two men shot and that the trial court had properly given a cautionary instruction that this evidence was to be considered only for the limited purpose of showing that the petitioner harbored ill will towards the victims and that the jury was not to consider it as evidence that the defendant was a person of bad character or criminal tendencies.

The Report and Recommendation properly concludes that Claim Three is without merit.  To be ineffective assistance, a counsel's conduct must be objectively unreasonable.  Strickland, 466 U.S. at 688.  Here, trial counsel acted reasonably by filing a motion to exclude the challenged evidence.  Trial counsel

renewed his objection prior to testimony by government witness
Kadir Greene about the August 15, 1996, incident and was
overruled.  7/23/97 N.T. at 125-26.  These actions do not amount
to ineffective assistance.

          The petitioner's appellate counsel included a challenge
to the introduction of evidence concerning the August 15, 1996,
incident in the Statement of the Questions Involved section of
the petitioner's direct appeal brief, but failed to address that
issue in the argument section of the brief.  The Pennsylvania
Superior Court held that the failure to discuss the issue in the
argument section waived it, and declined to address the merits of
the petitioner's claim.  For appellate counsel's failure to
preserve this issue to amount to ineffective assistance, there
must be a reasonable probability that, had the issue been
preserved, the result of the petitioner's appeal would have been
different.  Strickland, 466 U.S. at 688.  Here, as found by the
PCRA court, the "prior bad act" evidence concerning the August
15, 1996, shooting was admissible under state law to show the
"ill will" between the petitioner and victims.  See Commonwealth
v. Tedford, 960 A.2d 1, 42 (Pa. 2008) ("Evidence to prove motive,
intent, plan, design, ill will, or malice is always relevant in
criminal cases") (citing Commonwealth v. Gwaltney, 442 A.2d 236,
241 (Pa. 1982)) (on PCRA review, finding trial court properly
admitted evidence that the murder victim had stabbed a member of

36

the defendant's gang and that trial counsel was not ineffective
for failing to object the evidence).  Appellate counsel's failure
to preserve a challenge to the introduction of this evidence on
appeal was not ineffective assistance where that appeal would
have been meritless and could not have changed the outcome.

      2    Petitioner's Prosecutorial Misconduct Claims Four
          and Five Will Be Dismissed

      In Claims Four and Five, the petitioner contends that
the government engaged in prosecutorial misconduct.  In Claim
Four, the petitioner contends that the government's witness,
Detective Wyatt, lied when he testified that Abid Stevens was a
prime suspect in the murder of Anthony "Roster" Grant, and that
the prosecution was aware that this testimony was false and
failed to correct it, thereby committing prosecutorial
misconduct.  In Claim Five, the petitioner contends that the
government engaged in prosecutorial misconduct by withholding
evidence that one of its "key witnesses," Brian Randle, was also
a suspect in the murder of Anthony "Roster" Grant.

      Both Claim Four and Claim Five are based on a March 9,
1999, affidavit from Brian Randle.  In it, Randle states that, in
the middle of October 1996, when he was detained on robbery
charges, he was visited by Detective Wyatt and a Detective
Bamberski and questioned about the murder of Ruben Simmons.
Randle was told that he was a prime suspect in the murder of

37

Anthony "Roster" Grant and that, if Randle agreed to testify for the prosecution in the petitioner's trial, he would not be immediately charged for Grant's murder.  Randle says in the affidavit that he made an agreement with the detectives to testify against the petitioner, including signing a statement and making unspecified court appearances, but that "at the actual trial" of the petitioner, he was told to refrain from mentioning that he had been investigated for Grant's murder.  Randle was subsequently convicted of Anthony "Roster" Grant's murder.  He did not testify at the petitioner's trial.

As to Claim Four, the PCRA court found that petitioner had failed to demonstrate that Stevens was not a suspect in Anthony "Roster" Grant's murder and that Detective Wyatt's statement was false or that the prosecution knew that Wyatt's statement was false.  The Report and Recommendation agreed with the PCRA court's conclusion.  This Court also agrees.  The fact that Brian Randle may have been a prime suspect in the murder of Anthony "Roster" Grant does not establish that Abid Stevens was not also a prime suspect in that murder.  Other than Randle's statement, the petitioner has not presented any evidence to support his allegation that Detective Wyatt's statement was false, and this Court will therefore deny Claim Four.

The Report and Recommendation correctly concluded that Claim Five was meritless.  Brian Randle did not testify at the

38

petitioner's trial.  He was therefore not a "key witness" for the prosecution as the petitioner contends.  There is also no support for the petitioner's contention that the government withheld from the defense the fact that Randle was a suspect in Grant's murder. In its April 3, 2007, response to the habeas petition, the government provides two witness statements, both of which it asserts were turned over to the defense, in which witnesses say that both Abid Stevens and Brian Randle were involved in Grant's murder.

> 3   Petitioner's Claim Seven Concerning the PCRA Court's Denial of an Evidentiary Hearing Will Be Dismissed

In Claim Seven, the petitioner contends he was denied due process when the PCRA court denied his request for an evidentiary hearing concerning newly-acquired evidence:  the affidavits of Brian Randle and Brian Johnston.  The affidavit of Brian Randle has already been described in the discussion of the petitioner's Claim Four and Five.  The affidavit of Brian Johnston recanted his trial testimony identifying the petitioner as the shooter, stating that he did not see who shot either Ruben Simmons or himself.

The Report and Recommendation concludes that this claim is not cognizable in federal habeas proceedings because it concerns an alleged error in a collateral proceeding, not a

proceeding that actually led to the petitioner's conviction.  The
Court agrees.  Alleged errors in a collateral PCRA proceedings,
cannot be a proper basis for habeas relief from the original
conviction.  Abu-Jamal v. Horn, 520 F.3d 272. 297 (3d Cir. 2008);
Lambert v. Blackwell, 387 F.3d 210, 246 (3d Cir. 2004).


                    4    Petitioner's Actual Innocence Claim Will Be
                         Dismissed

          In Claim Nine, the petitioner argues that "as a result
of the errors, abuse and [c]onstitutional violations by the Trial
court and the prosecutor, and the inadequacies of the
petitioner's own defense counsel at trial and appeal . . . he is
suffering a fundamental miscarriage of justice as he is actually
innocent."

          The Report and Recommendation construes this claim as
an assertion that the petitioner is seeking to assert a
substantive claim of actual innocence as defined in Herrera v.
Collins, 506 U.S. 390 (1993).  In such a claim, a prisoner
contends that his actual innocence alone, without regard to the
presence or absence of constitutional errors in his trial or
direct appeal, justifies habeas relief.  The Report and
Recommendation suggests that such a claim is not cognizable in
habeas.  The Report and Recommendation also suggests that, to the
extent that Claim Nine is based on the "cumulative prejudice of

                                  40

the petitioner's claims," it should be denied because each
individual claim lacks merit.

In Herrera, the United States Supreme Court held that a
"freestanding" claim of actual innocence based on newly
discovered evidence does not state a ground for habeas relief,
except possibly in extraordinary circumstances involving a "truly
persuasive" showing of actual innocence in a capital case.
Herrera, 506 U.S. at 400, 417; see also id. at 419 (O'Connor, J.,
concurring).  Even assuming that Herrera permitted the petitioner
to raise a freestanding claim of actual innocence in this non-
capital case, such a showing would have to be "extraordinarily
high." Id. at 417; Albrecht v. Horn, 485 F.3d 103, 122 (3d Cir.
2007).

In addition to a freestanding substantive actual
innocence claim under Herrera, a habeas petition may also raise a
procedural actual innocence claim of the type considered in
Schlup v. Delo, 513 U.S. 298 (1995).  In such a claim a
petitioner contends, not that his actual innocence alone
justifies habeas relief, but rather that his actual innocence
should excuse the procedural default of other constitutional
claims.  Id. at 314.  In such a claim, actual innocence is "not
itself a constitutional claim, but instead a gateway through
which a habeas petitioner must pass to have his otherwise barred
constitutional claim considered on the merits."  Id. at 315

41

(citing Herrera, 506 at 404).  Here, the Court has found the
petitioner's Claim Six, Claim Eight and a portion of Claim Three
to be procedurally defaulted, but this default would be excused
if the petitioner can show actual innocence.

         To prevail on a procedural claim of actual innocence,
the habeas petitioner must show that it is more likely than not
that no reasonable juror would have convicted him in light of the
new evidence.  Schlup, 513 U.S. at 327.  This requires showing,
not just that the new evidence creates a reasonable doubt of the
petitioner's guilt, but that no reasonable juror would have found
the defendant guilty.  In assessing the petitioner's showing, a
district court is not bound by the rules of admissibility that
governed at trial, but may consider evidence that was unavailable
or excluded at trial.  Id. at 327-28.  In considering a
petitioner's new evidence, a court may consider how "the timing
of the submission and the likely credibility of the affiants"
bear on its reliability.  House v. Bell, 547 U.S. 518, 237 (2006)
(quoting Schlup at 331-32).  The reviewing court is not to make
an independent judgment of the facts, but is to assess the likely
impact of the evidence on reasonable jurors.

         The Court finds that the petitioner has failed to meet
the showing of actual innocence required for either a procedural
actual innocence claim under Schlup or a substantive claim under

Herrera.  As new evidence, the petitioner proffers the affidavits
of Brian Randle and Brian Johnston.

Randle's affidavit states that Randle was questioned by
Detectives Wyatt and Bamberski about the murder of Ruben Simmons;
that the detectives told Randle that he was a prime suspect in
the murder of Anthony "Roster" Grant; that the detectives told
Randle that, if he agreed to testify in Simmons' murder case, he
would not be immediately charged with the Grant murder; and that
Randle made an agreement to testify against the petitioner,
signed a statement, and testified in court.  The affidavit also
says "at the actual trial" of the petitioner, Randle was
instructed not to mention that he had been investigated for
Grant's murder.

Randle's affidavit does not bear directly on the
petitioner's guilt or innocence.  If accepted as true, it might
tend to impeach Detective Wyatt's testimony that Abid Stevens was
the prime suspect in the murder of Anthony "Roster" Grant
(although it does not directly contradict that testimony, since a
murder could have more than one prime suspect).  That issue,
however, is entirely collateral to whether the petitioner
committed the crimes for which he was convicted.  The credibility
of Randle's affidavit is also subject to doubt.  The affidavit
appears to say that Randle testified at the petitioner's trial:
"At the actual trial [of the petitioner], I was told to re[frain]

from any mentioning that I had been investigated for the murder of Anthony Grant."  Randle did not testify at the petitioner's trial, although the government concedes he may have been on its witness list because he is mentioned in the government's proposed voir dire.

In contrast to Randle's affidavit, Brian Johnston's affidavit directly bears on the question of the petitioner's guilt.  Johnston was the only witness who testified that he saw the petitioner commit the shooting that killed Ruben Simmons and wounded Johnston.  No other evidence directly linked the petitioner to the crime.  No other witness placed the petitioner at the scene of the shooting.  At trial, Johnston testified that he was at a dice game at the parking lot on Germantown Avenue with Ruben Simmons, Abid Stevens, and others, when the petitioner walked up to Ruben Simmons and said, "I heard you were looking for me," and began shooting.  Johnston testified that he and the others began to run.  Johnston ran half a block away and tried to hide and saw the petitioner walking toward him.  Johnston ran back toward the parking lot and was shot in the foot.  Johnston testified that he then went to a friend's house where the police were called and he was taken to the hospital.  He testified that later that evening he identified the petitioner as the shooter out of a photo array.  At trial, the government presented testimony from two police officers who responded to the call from

Johnston's friends house who both testified that Johnston identified the petitioner as the shooter, as well as testimony from the officer who presented Johnston with the photo array later that night.

Johnston's affidavit dated December 10, 1999, two and a half years after the trial, states that "now that [Johnston] knows what it's like being in jail," he wants to "clear his conscience." He says that, "at the time of the shooting" he had gone to Ruben Simmons' car to get beer and was returning to the parking lot when he heard shooting and saw people running. He started to run and later realized he had been shot. The affidavit says that, after he went to his friend Percy's house (where he was when the police arrived and took him to the hospital), he and Percy talked about the incident. The affidavit says that "Percy told me that Lamont [the petitioner] had shot him so I believed that Lamont had shot me and Ruben also, but truthfully I really didn't know."

Statements by recanting witnesses are "properly viewed with great suspicion," among other reasons, because they are "very often unreliable and given for suspect motives." Dobbert v. Wainwright, 468 U.S. 1231, 1238 (1984) (denial of writ of certiorari) (Brennan, J., dissenting). Here, Johnston's recanting affidavit contradicts his detailed testimony at trial and his prior statements the night of the shooting identifying

the petitioner as the man who shot him and Ruben Simmons. Johnston's testimony at trial, unlike that of the defense's eyewitness, was consistent with the forensic and ballistic evidence presented at trial.

The ballistic evidence showed that there were bullet casings both in the parking lot and 300 feet away, near where Johnston testified at trial that he was shot. This is consistent with Johnston's testimony that, after the shooting started, he ran a half a block away and was shot when he saw the petitioner walking towards him on the opposite side of the street and tried to run back to the parking lot. The ballistic evidence is not consistent with Johnston's recanting affidavit, which states that he was shot as he was returning to the parking lot with a can of beer, as other people were running away. Had Johnston been shot in the manner described in the affidavit, all of the petitioner's shots would have been fired from the parking lot, which is inconsistent with the two shell casings found 300 feet away.

The forensic evidence showed no stippling on Ruben Simmons' wounds, consistent with his being shot from greater than two or two and a half feet away, as Johnston testified. It is not consistent with the testimony of the defense's eyewitness to the shooting, Abid Stevens, who testified that the man he identified as the shooter, Anthony "Roster" Grant, shot Ruben Simmons from close range, as they were struggling with the gun.

46

Abid Stevens testimony was also equivocal as to the identity of the shooter.  Stevens testified that he did not get a good look at the shooter's face and could identify him as "Roster" Grant only by his accent when he spoke.  He testified that he could not be sure whether the petitioner was present at the scene and could not say for sure that the petitioner did not fire the shots that killed Ruben Simmons.

The petitioner's alibi witness, his girlfriend, Joanne McDowell, testified that the petitioner had moved in with her on August 12, 1996, and was with her the entire night of the shooting.  McDowell's credibility, however, was undercut on cross-examination.  McDowell did not tell the police that the petitioner was with her the night of the murder in her formal statement after the petitioner's arrest.  She also told the police on the day of the petitioner's arrest that Gist was not living with her.  Although McDowell explained these discrepancies, a reasonable juror could have disbelieved her testimony.

Considering the petitioner's new evidence, together with the evidence presented at trial, the Court finds that the petitioner has not made the showing required for a procedural claim of actual innocence under Schlup.  The Court cannot find that no reasonable juror weighing this evidence could find the defendant guilty beyond a reasonable doubt.  A reasonable juror

47

could disbelieve Brian Johnston's subsequent recantation of his trial testimony and instead credit his identification of the petitioner as the shooter at trial and in statements the night of the shooting over the contrary evidence of Abid Stevens and Joanne McDowell.  Having found that the petitioner has not met the showing required for a procedural claim under <u>Schlup</u>, the Court finds that the petitioner cannot meet the even higher standard required for a substantive claim under <u>Herrera</u>.  Both of the petitioner's claims of actual innocence will therefore be dismissed.

    D.    <u>The Request for an Evidentiary Hearing Will Be Denied</u>

        The petitioner requested an evidentiary hearing in his objections to the Report and Recommendation.[3]  The petitioner

---

[3]     The petitioner does not appear to have requested an evidentiary hearing prior to the issuance of the instant Report and Recommendation.  The petitioner did not request an evidentiary hearing in his initial habeas petition or his initial supporting memorandum of law.  After the government argued in its response that the petitioner's claims were time-barred because of his failure to file a timely PCRA appeal, the petitioner requested an evidentiary hearing in his reply in support of his petition in order to "develop the facts" concerning his PCRA counsel's failure to comply with his request to file an appeal. After Magistrate Judge Caracappa issued a Report and Recommendation without an evidentiary hearing, finding the petition time-barred, the petitioner renewed his request for a hearing on his PCRA's counsel's alleged dereliction in his objections.  This request was mooted when the petitioner's objections were sustained by Judge Kauffman, who found that the limitations period for the petitioner's habeas was equitably tolled.

    After remand to Judge Caracappa for consideration on

filed two sets of objections to the Report and Recommendation, an
initial set filed pro se and a supplemental set filed through
counsel.  The last sentence of the pro se objections requests
that the Court "Order that the petitioner be granted an
evidentiary hearing and/or a new trial based on the merits of the
Constitutional violations presented before this Court."  The
second set of objections, filed by counsel, specifically requests
an evidentiary hearing as to both pieces of "newly acquired"
evidence proffered by the petitioner:  the affidavit of Brian
Randle and the affidavit of Brian Johnson.

        A hearing is requested as to Randle so that he "can
testify, and information from police files can be disclosed to
show that [the] police not only suspected Randle in the Grant
murder but were on the verge of charging him with that murder."
Docket No. 49 at 19.  A hearing is requested as to Johnston so
that a judge "can see and hear Johnston testify, amplify his
affidavit, and face cross-examination."  Id. at 25.  The
government filed separate responses to the petitioner's

_____

the merits, the government filed a supplemental response to the
petition and the petitioner, proceeding pro se, filed a reply.
The last sentence of the reply asks that the Magistrate Judge
"grant the petitioner's Petition for Writ of Habeas Corpus and
Order a New Trial or in the alternative, set a date for a hearing
on all the petitioner's claims."  It is not clear whether this
sentence is requesting that the hearing be held in federal court
on the petitioner's habeas claims or requesting that the federal
court order a hearing in state court.  Judge Caracappa's second
Report and Recommendation does not address the issue of an
evidentiary hearing.

objections, neither of which addresses whether to grant an evidentiary hearing.

        1    The Request for an Evidentiary Hearing Must Be Denied Under § 2254(e)(2)

     The Court will deny the request for an evidentiary hearing.  The availability of an evidentiary hearing is restricted by AEDPA.  The relevant provision of the statute is codified at 28 U.S.C. § 2254(e)(2).  It provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

     The threshold issue to determine if the restrictions of this provision apply is whether the petitioner "failed to develop the factual basis of a claim in State Court proceedings."

50

Wiliams v. Taylor, 529 U.S. 420, 430 (2000).  A failure to develop is established by lack of diligence or some greater fault attributable to the prisoner or the prisoner's counsel. Diligence "will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."  Id. at 437.

   The Court finds that the petitioner failed to develop the factual basis of his claim in his state PCRA proceedings because he failed to request an evidentiary hearing in that forum on the Randle and Johnston affidavits.  The petitioner attached both affidavits to his PCRA petition and relied upon them in advancing his PCRA claims of prosecutorial misconduct and actual innocence/exculpation, but he did not request that the PCRA court hold an evidentiary hearing.  The petitioner's initial PCRA petition, prepared pro se, requested an evidentiary hearing "on ineffective assistance issues," but not on the prosecutorial misconduct or actual innocence issues supported by the affidavits.  The supplemental PCRA petition and memorandum prepared by counsel does not mention an evidentiary hearing. Although the petitioner has challenged the PCRA court's failure to hold an evidentiary hearing in this habeas petition, he does not affirmatively state that he requested such a hearing before the PCRA.

As suggested in <u>Williams</u>, the failure to request an evidentiary hearing in state court on the petitioner's newly proffered affidavits demonstrates sufficient lack of diligence to establish that he "failed to develop" the factual basis of his claim.  The petitioner therefore must satisfy the requirements of § 2254(e)(2) to obtain an evidentiary hearing.

The Court finds that the petitioner has not made the showing required by § 2254(e)(2) to obtain an evidentiary hearing.  Under § 2254(e)(2), to be entitled to a hearing, the Randle and Johnston affidavits would have to be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the petitioner guilty.  § 2254(e)(2)(B).  The Court has already found in its discussion of the petitioner's claim of actual innocence that the petitioner cannot make this showing even under the lower standard of a preponderance of the evidence, as required to establish a procedural claim of actual innocence under <u>Schlup</u>.  513 U.S. at 327.  Because § 2254(e)(2) is not met, the petitioner is not entitled to an evidentiary hearing.

2    The Request for an Evidentiary Hearing Would Be
     <u>Denied Even if § 2254(e)(2) Did Not Apply</u>

Even if the Court could find that the petitioner exercised sufficient diligence in developing his claims concerning the affidavits to avoid the application of

52

§ 2254(e)(2), the Court would still find that the petitioner is not entitled to an evidentiary hearing.  If § 2254(e)(2) did not apply, the decision to grant an evidentiary hearing would rest in the discretion of the trial court.  Schiro v. Landrigan, 550 U.S. 465, 467 (2007).  In exercising that discretion, a court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  Id. at 474.  A court must take into account the deferential standards of § 2254 in determining whether an evidentiary hearing would be appropriate.  Id.  Where the petitioner's factual allegations are contradicted by the factual record or where the petitioner has failed to present sufficient evidence to rebut state court factual findings, a court is not required to hold an evidentiary hearing.  Id.

Even if § 2254(e)(2) did not apply here, no evidentiary hearing would be warranted concerning the Randle affidavit.  The Randle affidavit is a basis for Claim Four (prosecutorial misconduct from Detective Wyatt's allegedly perjured statement that Abid Stevens was a prime suspect in the Grant murder), Claim Five (prosecutorial misconduct from withholding evidence that Randle was a suspect in the Grant murder), and Claim Nine (actual innocence).  In dismissing Claim Four and Claim Five, the Court assumed the allegations of the Randle affidavit were true and

53

still found no merit to those claims.  Although the Court
considered the credibility of the Randle affidavit in dismissing
the petitioner's actual innocence claims, the Court finds that
even assuming the truth of the affidavit, the petitioner would
still fail to meet the required showing to prevail on those
claims.

        If § 2254(e)(2) did not apply, the issue of whether to
hold an evidentiary hearing on the Johnston affidavit would
present a closer question than the Randle affidavit.  If the
statements in the Johnston affidavit are taken as true, then they
recant both Johnston's sworn testimony at trial and his prior
statements the night of the shooting, identifying the petitioner
as the man who wounded him and killed Ruben Simmons.  Because
this identification is the only direct evidence that the
petitioner committed the crime, a credible recantation could
support a colorable claim of actual innocence.  In deciding
whether to hold an evidentiary hearing, however, the Court must
consider the restrictions of § 2254.  Schiro, 550 U.S. at 474.
Under § 2254(e)(1), a state court's factual determination is
presumed to be correct and a petitioner has the burden of
rebutting this presumption by clear and convincing evidence.

        Here, the state PCRA court found that the Johnston
affidavit was not credible from the face of the affidavit,
without holding an evidentiary hearing.  The fact that no hearing

54

was held does not automatically prevent the PCRA court's decision from being entitled to the presumption of correctness, but it is a factor in considering whether deference should apply.  <u>Fahy v. Horn</u>, 516 F.3d 169, 183 (3d Cir. 2008).

Here, Johnston's affidavit contradicts his trial testimony and his earlier statements.  It also, as discussed earlier, contradicts the ballistic evidence.  The ballistic evidence showed that the shooter fired his gun both in the parking lot and 300 feet away.  This is consistent with Johnston's trial testimony that he was shot after the petitioner moved a half block away from the parking lot, toward where Johnston was hiding, and inconsistent with Johnston's affidavit, which suggests that he was shot as he returned to the parking lot.

Given these facial inconsistencies between the affidavit and the ballistic evidence, the PCRA court had a reasonable basis for finding that Johnston's affidavit was not credible without holding an evidentiary hearing.  The Court therefore cannot say that the PCRA court's factual determination of credibility is not entitled to AEDPA's presumption of correctness.  Because the PCRA court's presumption applies, the petitioner can only rebut it by a showing of clear and convincing evidence that Johnston's affidavit is credible.  The petitioner has not made such a showing.  Given the petitioner's failure to

present sufficient evidence to rebut the PCRA court's factual findings on Johnston's credibility, the Court would decline to order an evidentiary hearing on the Johnston affidavit, even if § 2254(e)(2) did not independently bar such a hearing.  <u>See Schiro</u>, 550 U.S. at 474 (noting that a court need not order an evidentiary hearing where a petitioner has failed to rebut a state court's factual findings).

     E.   <u>No Certificate of Appealability Will Be Issued</u>

     The Court has denied some of the petitioner's claims on the merits and found others to be procedurally defaulted.  If a constitutional claim is rejected on the merits, a certificate of appealability should issue when reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  If a claim is dismissed on procedural grounds without reaching the merits, a certificate of appealability should issue only when the petitioner shows both that reasonable jurists would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that reasonable jurists would find it debatable whether the district court was correct in its procedural ruling.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484-85 (2000).  The Court finds that neither showing has been met here and that there are no grounds for the issuance of a certificate of appealability.

An appropriate Order will be issued separately.